## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RONNY RUTLEDGE**, | |
| Plaintiff, | |
| v. | Case No. 23-cv-1583 (CRC) |
| **CARLOS DEL TORO**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

In 2016, Plaintiff Ronny Rutledge, an active-duty sailor in the Navy, was stripped of his Special Warfare Operator Navy Enlisted Classification and Navy Sea-Air-Land ("SEAL") rating for reported performance deficiencies that caused his commanding officer to lose faith in his ability to meet the demanding standards required of a Navy SEAL.  Believing his demotion was spurred by retaliatory animus for his suspected whistleblowing and orchestrated through a sham hearing that violated protocol, years later, Rutledge filed a petition with the Board for Correction of Naval Records ("BCNR" or "the Board") to restore his lost designations.  The BCNR denied the petition in a two-page opinion which concluded, without much elaboration, that Rutledge had not presented sufficient evidence to rebut the ordinary presumption of regularity in military disciplinary matters.  Rutledge responded by filing this lawsuit, which challenges the Board's decision under the Administrative Procedure Act ("APA"), 60 Stat. 237, as amended, 5 U.S.C. § 500 <u>et seq.</u>  Finding that the Board did not adequately explain the bases for its decision, the Court will grant Rutledge's motion for summary judgment and remand this matter for the Board to fill in the gaps in its reasoning.

I.    **Background**

A.  Legal Background

Under the Navy Enlisted Occupational Classification System, every sailor in the U.S.

Navy is assigned an "enlisted rating" corresponding with the type of work they perform in the

military.  See NAVPERS 18068F, Vol. I, Intro., at 1.  Within this classification system, Navy

enlisted classification codes ("NECs") are assigned to sailors who complete specific trainings to

"show that the person has obtained certain skills or knowledge and is qualified for detailing to a

billet."  Id. ¶ B.2.  Relevant here, sailors who qualify for and successfully complete the Special

Warfare Operator training school receive the Special Warfare Operator NEC, have their enlisted

rating converted to "Navy SEAL Operator," and become eligible for assignment to Navy SEAL

commands and billets.  Those designations are not necessarily permanent, however.

As detailed in the Commander, Naval Special Warfare Command Instruction 1221.1, a

commanding officer may recommend revocation of a sailor's Special Warfare Operator NEC and

Navy SEAL status if she determines that the sailor is "no longer suitable for assignment in that

rating."  Navy MSJ, Ex. A ("Instruction 1221.1") at 1.  A commanding officer's loss of "faith

and confidence in a sailor's ability to exercise sound judgment, reliability, and personal conduct"

is one of the "primary reasons for revocation of a member's" ranking.  Id. at 1–2.  In such cases,

the revocation recommendation "must be substantiated by sufficient background and reasonable

justification."  Id. at 1.

In deciding whether to seek revocation, commanding officers may choose to convene a

multi-member committee, known as a Trident Review Board ("TRB"), which will hold a hearing

and submit a "Review Board Report" to the commanding officer.  Id., Encl. 1.  While "there is

no requirement" to convene a TRB, commanding officers "are strongly encouraged to conduct one prior to recommending removal of an enlisted member's NEC." Id. at 1.

If a commanding officer opts to assemble a TRB, Instruction 1221.1 carefully prescribes its form and function. A TRB must consist of (1) one sailor in the pay grade of Master Chief Petty Officer to serve as Chairman; (2) at least one officer between the pay grades of O-3 and O-5, or in the case of a warrant officer, between the pay grades of W-3 and W-5; and (3) three to five additional sailors between the pay grades of E-7 and E-9. Id., Encl. 1 ¶ 1. Moreover, prospective TRB members are disqualified if they "can reasonably be expected to be called as a witness" or "may find it difficult to render a fair and impartial recommendation solely upon the evidence presented at the Board." Id., Encl. 1 ¶ 3.

A commanding officer assembles the TRB by issuing a convening order to the Chairman, who then provides a "notification letter" to the sailor under review. Id., Encl. 1 ¶ 4; id., Encl. 3 (sample notification letter). The Chairman is instructed to "ensure the hearing is conducted expeditiously and with due regard for the [sailor's] rights." Id., Encl. 1 ¶ 6. The sailor at issue has a right to "review any documentary evidence to be considered by the Board" and "to refute evidence that is presented, call witnesses, and present evidence on [his] own behalf." Id., Encl. 3 ¶ 3. All witness requests must be submitted to the commanding officer for approval before the hearing. Id.

At the close of the hearing, TRB members vote to recommend one of four options: (1) no corrective action, allowing the sailor to retain the Special Warfare Operator NEC; (2) a six-month probationary status; (3) revocation of the Sailor's Special Warfare Operator NEC and reassignment to a different rating; or (4) revocation paired with separation from the Navy. Id., Encl. 1 ¶ 7. A majority vote is required to submit a recommendation to the commanding officer.

3

Id.  The commanding officer must consider the recommendation, but she is not bound by it.  Id.,
Encl. 1 ¶ 9.  If the commanding officer recommends the revocation of a sailor's Special Warfare
Operator designation, she submits that recommendation to the Bureau of Naval Personnel.  See
id.  That recommendation is then forwarded to Navy Personnel Command, which is ultimately
responsible for deciding whether to remove the designation and involuntarily convert the sailor
to a different rating.  See MILPERSMAN 1220-400 ¶ 13(a).

Sailors may challenge their revocation before the BCNR.  Congress has authorized the
Secretaries of the military departments to amend "any military record" whenever "necessary to
correct an error or remove an injustice."  10 U.S.C. § 1552(a)(1).  The Secretary of the Navy has
exercised this authority by establishing the BCNR "for the purpose of determining the existence
of error or injustice in the naval records of current and former members of the Navy and Marine
Corps."  32 C.F.R. § 723.2(b).  Former or currently serving Navy members can petition the
BCNR to correct their military records by submitting a DD-149 Form.  Id. § 723.3(a)(1).  Upon
receipt of the DD-149 Form, the Board determines whether there is any "error or injustice in the
naval records" and then makes "recommendations to the Secretary or [takes] corrective action on
the Secretary's behalf when authorized."  Id. § 723.2(b).  Because the BCNR is "not an
investigative body," id., applicants bear the burden of demonstrating "the existence of probable
material error or injustice," id. § 723.3(e)(1).  In weighing the evidence, the Board "relies on a
presumption of regularity to support the official actions of public officers and, in the absence of
substantial evidence to the contrary, will presume that they have properly discharged their
official duties."  Id. § 723.3(e)(2).

B.  <u>Factual and Procedural Background</u>

Rutledge joined the United States Army as a Civil Affairs Specialist around 2001.  <u>See</u> AR 62, 70.  He served in the Army for eight years, steadily ascending the ranks, until he received an honorable discharge to pursue becoming a Navy SEAL.  <u>See</u> AR 70, 172.

After enlisting in the Navy in 2011 under the Prior Service Program, Rutledge attended a Special Warfare Operator training school where he received his Special Warfare Operator NEC and Navy SEAL "trident."  AR 113–17, 214.  Despite receiving passing scores, <u>see</u> AR 214–17, his training was not entirely smooth sailing.  During the third phase of training in February 2012, Rutledge alleges he "was the subject of conduct from one of the instructors, Danny Nizbit, which bordered on inappropriate."  AR 70.  "Although [he] did not report the incident," Rutledge says, "*someone* did and, as a result, [he] was [wrongly] labeled as a rat."  <u>Id.</u> (emphasis in original).

Upon completing his training, Rutledge was assigned to SEAL Delivery Vehicle Team 1 in July 2013 and then placed in Alpha Platoon SDV Team 1 the following May.  AR 115, 220.  During his first year, Rutledge received satisfactory marks and, like the other four sailors in his cohort, was designated as "Promotable."  AR 220–21.  Things quickly deteriorated, however, as Rutledge received a series of official reprimands, known as "counselings."  First, on December 9, 2014, Rutledge was counseled for "display[ing] unprofessional conduct and unsatisfactory performance in simulated operational environments."  AR 96.  Then, in January 2015, his Officer-in-Charge, Lieutenant John Shaffo, counseled Rutledge for using his official email address to contact a representative from the Central Intelligence Agency concerning training opportunities without first running the request up his chain of command.  AR 71, 83, 97.  One month later, he was counseled again for "jumping the chain of command" after he reached out to SOCS Adam Helgesen for "career advice" and to discuss "personal issues."  AR 71.  Then, in

spring of 2015, Rutledge received another counseling for not informing his Assistant Officer-in-Charge that he was unable to attend a quality-assurance check of his platoon's supply department.  AR 97.  That August, Rutledge was counseled once more for missing the platoon's morning muster.  AR 84.  And in September, he was counseled for failing to procure waterproof bags in a timely manner and then relieved of his "[s]upply department duties for a consistent failure to follow through with responsibilities."  AR 74, 94.

Following these counselings, in November, Rutledge received a Letter of Instruction ("LOI") from Lieutenant Shaffo documenting each of these incidents and providing instructions for improving his performance.  See AR 96–99.  Among these instructions was a directive that Rutledge "dive with the same dive buddy for the [next six months] in order to provide consistent feedback towards [his] performance."  AR 97.  Accordingly, over the next two months, Rutledge says he completed "approximately 15–20 successful dives" with his assigned "dive buddy."  AR 74.  But then in February 2016, his commanding officer, SOC Ian Brightbill, allegedly deviated from the LOI by replacing his usual dive buddy with another sailor, SO1 Horney.  AR 38.  After two unsuccessful dives with SO1 Horney, Rutledge claims that he was counseled once again.  Id.

Shortly thereafter, in March 2016, Rutledge's commanding officer convened a TRB, which unanimously voted to revoke his Special Warfare Operator NEC and Navy SEAL trident.  AR 1–2, 11–12.  His commanding officer agreed with the recommendation and submitted it to the Bureau of Naval Personnel.  AR 12.  Rutledge's NEC and Navy SEAL trident were officially revoked one month later.  AR 110.  No longer eligible to perform duties as a SEAL, Rutledge was detached from the Alpha Platoon the following January and enrolled in Parachute Rigger school.  AR 12, 233, 239.  After completing a new round of training, Rutledge was converted to Parachute Rigger Second in the Special Board Team Twenty command.  Id.

6

Five years later, in April 2021, Rutledge filed an application with the BCNR to correct his naval records, requesting, among other things, that the Board reinstate all "rights as a Navy SEAL, including the return of [his] trident" and promote him to the next enlisted grade. AR 65, 81. In support of his request, Rutledge submitted a brief claiming that (1) he was stripped of his trident as retaliation stemming from the purported hazing that had occurred during his training; and (2) the TRB failed to comply with the procedural requirements set forth in Instruction 1221.1. See AR 68–79.

On the first score, Rutledge argued that his counselings in 2015 and 2016 were fig leaves shrouding what was, in actuality, payback for his suspected squealing on his training instructor. AR 71. In Rutledge's telling, "[i]mmediately upon joining Alpha Platoon" in 2014, he "was confronted by several senior SEALs regarding the incident with Mr. Nizbit" who threatened they "would make him pay for what happened" and cautioned that he "better watch his back." Id. Those threats were borne out, Rutledge says, as he was "improperly counseled repeatedly for nonexistent issues to create a paper trail in support of kicking him out of the [SEAL] teams." Rutledge MSJ at 2.

Attempting to support this charge of retaliation, Rutledge contested his various counselings one by one. *First*, he asserted that his two counselings in early 2015 for purportedly breaking rank were baseless because, in his view, he did nothing wrong by requesting further training opportunities or seeking advice from senior brass. AR 71–72. *Second*, he claimed his counseling for missing the platoon muster that August was undeserved because he had faithfully followed a directive to report to the SDVT-1 Paraloft at 4:00 a.m. but, unbeknownst to him, other members of his team were directed to attend a muster elsewhere at 4:30 that morning via a text-message chain that did not include him. AR 72. *Third*, Rutledge alleged that S01 Horney

violated protocol that month by inserting a counselling into his file, citing a lack of professionalism and erratic performance, without meeting with Rutledge (as is required).  AR 73. *Fourth*, as to the September counseling for failing to obtain waterproof bags, Rutledge argued that—contrary to the timeline in the counseling, which was itself misdated—he was given only five business days to procure the bags even though the supplier informed him by email that the production time was around 10 to 12 weeks.  AR 72–73.  *Finally*, on his last counseling, Rutledge maintained that he was set up for failure by his platoon chief, SOC Brightbill, who deviated from the LOI by subbing out his usual partner, with whom he had completed numerous successful dives, for S01 Horney—the same officer who had covertly "recommended in written counseling that [Rutledge] be removed from the platoon."  AR 75.  With SOC Brightbill observing from the navigator's seat, unlike his prior dives which had gone off without a hitch, Rutledge alleged that he was "[un]suprisingly" counseled after these two dives and that SOC Brightbill used these failed dives to refer Rutledge for a performance review.  Id.

Rutledge concluded that these counselings were out of step with his annual performance reviews before, during, and after his tenure in the Alpha Platoon, which uniformly reported that he was a reliable soldier turned sailor.  See AR 86–88, 214–40.  He also submitted professional and character references corroborating these more positive reviews.  See AR 100–07.  Based on this evidence, Rutledge surmised, his involuntary change of rating must have been "orchestrated as an act of retaliation" premised on "fabricated performance issues."  Rutledge MSJ at 9.

On the second charge, Rutledge maintained that his TRB brazenly violated the procedural requirements specified in Instruction 1221.1.  Rutledge first claimed he was not provided proper notice even though Instruction 1221.1 mandates that sailors receive a notification letter alerting them to the hearing and advising them of their "rights and privileges."  See Instruction 1221.1,

Encl. 3 (model notice letter).  Instead, two days before the hearing, Rutledge says "he was casually informed" by a fellow sailor that what he had thought would be a regular performance review was actually a formal hearing before a TRB.  AR 76.  Because his "chain of command never informed him, in recommended written format or otherwise, until the day prior, that he would be going before" a TRB, Rutledge laments, he walked "into the lion's den unprepared and uninformed."  AR 77.  This procedural unfairness allegedly continued into the hearing before the nine-member TRB, which included both SOC Brightbill and SOCS Helgesen  See AR 76. Rutledge claimed "[h]is attempts to present evidence and his testimony to the Board were denied," as he was dressed down and instructed to remain silent whenever he tried to present his case.  Id.  Finally, Rutledge asserted that, after the hearing, he was not able to read the "Review Board Report," which was never added to his file.  AR 78.  In all, Rutledge concluded, it was "not hard to discern from these circumstances that [he] was not afforded his due process rights and was improperly brought before the board in clear violation of" Instruction 1221.1  Id.

Before ruling on Rutledge's petition, the BCNR received an Advisory Opinion from the Bureau of Naval Personnel's Office of Legal Counsel, which recommended that the Board decline to correct Rutledge's naval records because he did not present sufficient evidence to "show[] a material error or injustice occurred nor [did] he meet his burden to overcome the presumption of regularity attached to the official actions of the Navy."  AR 12.  On the TRB's alleged irregularities—namely, Rutledge's claims that "he was not notified of the TRB, was not permitted an opportunity to present evidence during the TRB, and never saw a findings report following the TRB"—the Advisory Opinion determined that because "a TRB is encouraged but not required . . . any irregularities with respect to a TRB [cannot] constitute a material error or injustice."  AR 11.  "Additionally," it continued, Rutledge "provide[d] no evidence or witness

statements to support these allegations, and any findings report would have remained internal to the command and disposed of in accordance with records retention procedures" and thus "would not have been added to [Rutledge's] military record." Id. The Advisory Opinion also faulted Rutledge for "fail[ing] to avail himself of the mechanisms available to Sailors to address injustices by their chains of command, such as Article 138 or 1150 complaints, when the alleged error was first identified and all information related to it could be readily obtained." Id. As to the retaliation claim, the Advisory Opinion found that the revocation was supported by military records showing that Rutledge "was counseled on numerous occasions." Id. Although Rutledge had argued that these counselings "did not reflect his actual performance," the Advisory Opinion concluded that those performance evaluations "paint[ed] a different picture." Id. His annual reviews from 2014–15 and 2015–16 "conveyed a sense of average or even lackluster performance," it found, because Rutledge remained in the "Promotable" category and saw his average rating dip "even with a higher Summary Group Average and smaller group." AR 11–12. "These factors," the Advisory Opinion resolved, "indicate that the [annual performance reviews] were a reflection of the [same deficient] performance documented in [Rutledge's] counselings." Id.

Rutledge submitted a rebuttal in December 2022. AR 8. On the TRB proceedings, he attempted to refute the Advisory Opinion's assessment while also expressly arguing, for the first time, that the TRB had violated Instruction 1221.1's disqualification provision because "[a]t least two of the members were not able to render impartial judgment," noting that "SOC Brightbill in [particular] was integrally involved in the allegations against" him. AR 21. Building out his retaliation claim as well, Rutledge submitted additional character references and a favorable performance review immediately following his dismissal that was allegedly not properly entered

into his file.  AR 42, 61.  He also appended a letter from Captain Christopher Wear, a SEAL Officer and Naval Special Warfare operator who had served on TRBs in the past, which echoed many of Rutledge's critiques of the counselings.  AR 62.  Wear opined that the counselings for "not using the Chain of Command" were unwarranted and identified several inaccuracies in the others that, in his view, overstated the gravity of any misconduct.  AR 62–63.  He also contested the Advisory Opinion's negative gloss on Rutledge's annual performance reviews, explaining that a "Promotable" rating is "commonplace" and does not "indicate substandard performance" because all new Navy SEALs receive this mark upon joining their platoon.  AR 62.  "[T]aken in aggregate," Wear offered, the counseling records "appear to be generated in order to shape a narrative consistent with NEC removal."  AR 63.

A three-member panel of the BCNR sat in executive session in December 2022 and, a few months later, issued a two-page opinion denying Rutledge's petition.  AR 1.  The opinion opened by explaining that the Board had considered Rutledge's "applications, together with all material submitted in support thereof"; relevant portions of his military record; applicable statutes, regulations, and policies; the Advisory Opinion from the Office of General Counsel; and Rutledge's rebuttal.  Id.  It then outlined Rutledge's various arguments, first acknowledging his contention that the TRB had violated Instruction 1221.1.  Id.  "Specifically," it recounted, "you assert you were not timely notified of the Trident Review Board, you were not permitted an opportunity to present evidence during the Trident Review Board, and you never saw a finding report."  Id.  "You also conten[d] that the involuntary change of rating was contrary to procedure and it was done as an act of retaliation," it added.  Id.  After sketching out these arguments, the Board swiftly dispensed with them:

> In response to the [Advisory Opinion], you maintain that the NEC and special pay was improperly removed and denied.  The Board, however, substantially concurred

with the [Advisory Opinion] that the removal of Petitioner's NEC and special pay was proper based on his [Commanding Officer's] loss of confidence. Specifically, the Board noted that between January and November of 2015, you received multiple counselings which annotated deficiencies which you were instructed needed to be corrected. Further, the Board noted that although the [Instruction] 1221.1 strongly encourages Commanding Officers to conduct a [TRB] it is not required. The Board noted that based upon your own description of the requirements as well as further review of the policy you provided, that your command conducted the [TRB] on 31 March 2016. Thus, the Board determined the evidence did not demonstrate that a material error or injustice occurred which would warrant corrective action. Moreover, the Board relies on a presumption of regularity to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties. The Board found your evidence insufficient to overcome this presumption.

AR 2.

Rutledge filed the present lawsuit in June 2023. His complaint alleges that the Board's decision violates the APA because it was "arbitrary and capricious, an abuse of discretion, and contrary to law," in violation of 5 U.S.C. § 706(2). Compl. ¶ 38. In particular, he contends that the BCNR "misinterpreted and misapplied the applicable Instruction and Manual" governing the TRB and "failed to address or explain a reason to disregard substantial evidence" concerning his supervising officers' alleged retaliatory motive. Id. ¶¶ 35–36. Pending before the Court now are the parties' dueling motions for summary judgment.

## II. Legal Standards

When evaluating cross motions for summary judgment under the APA, "the Rule 56 standard does not apply." Alfa Int'l Seafood v. Ross, 264 F. Supp. 3d 23, 36 (D.D.C. 2017). The court instead "sits as an appellate tribunal," and "[t]he entire case on review is a question of law." Id. (quoting Am. Biosci., Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). Judicial review is limited to "deciding whether, as a matter of law, an agency action is supported

by the administrative record and is otherwise consistent with the APA standard of review." Gulf Restoration Network v. Bernhardt, 456 F. Supp. 3d 81, 93 (D.D.C. 2020).

Under the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

The BCNR's "decision to deny corrective relief is reviewable under the APA." Kreis v. Sec'y of Air Force, 866 F.2d 1508, 1515 (D.C. Cir. 1989). Those decisions, however, receive "an unusually deferential application of the arbitrary or capricious standard." Cone v. Caldera, 223 F.3d 789, 793 (D.C. Cir. 2000) (cleaned up). This particularly deferential standard of review reflects the broad discretion conferred to the military by statute and "ensure[s] that the courts do not become a forum for appeals by every soldier dissatisfied with his or her ratings, a result that would destabilize military command and take the judiciary far afield of its area of competence." Id. Under this narrow scope of review, the Court must "limit [its] inquiry to whether the [BCNR]'s decision making process was deficient, not whether [the Board's] decision was correct." Roberts v. United States, 741 F.3d 152, 158 (D.C. Cir. 2014) (quotation marks omitted).

Even under this highly deferential standard of review, the Board still must adequately explain its decision, and failure to do so warrants a remand.  See Dickson v. Sec'y of Def., 68 F.3d 1396, 1404–07 (D.C. Cir. 1995).  Relevant here, a plaintiff may rebut the presumption of correctness afforded to the BCNR's decisions by showing that the Board failed to respond to an argument that is not "frivolous on [its] face and could affect the Board's ultimate disposition." Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997).

## III.  Analysis

Although BCNR decisions rightly receive substantial deference, the Court cannot defer into a void.  To ensure meaningful judicial review, the Board must adequately explain its reasoning and address each nonfrivolous argument that a petitioner raises.  It failed to do so here. First, the Board relied on the undisputed fact that Rutledge had been counseled numerous times without addressing Rutledge's core contention that these counselings were improper, erroneous, and engineered to exact revenge for his suspected whistleblowing.  Second, while the Board did offer some account for why it was unpersuaded by Rutledge's claims of procedural irregularity in his TRB hearing, it seemingly overlooked his argument that two TRB members should have been disqualified because they were personally involved in some of the incidents and potentially biased against him.  Accordingly, while the Court does not question the propriety of the Board's decision, it must grant Rutledge's motion for summary judgment and remand this matter to the Board for a more complete explanation.

### A.  Retaliation Claim

Rutledge's central contention before the Board was that his dismissal from the SEALs was illicit retaliation stemming from his supposed mistreatment during training and that, as part of that scheme, his supervising officers had concocted the counselings to create a paper trail that

would support his removal.  The Board failed to engage with this core accusation, which may sound in conspiracy theory but is not frivolous on its face.  Rather, the Board seemed to accept the counselings at face value, concluding that the record provided a legitimate basis for the commanding officer's loss of confidence, without grappling with the arguments and contrary evidence that Rutledge had presented.  Even under the relaxed standard of review, this sort of summary denial that skips over the petitioner's primary allegation does not pass muster.

As outlined above, Rutledge claimed that his counselings were reprisal for his suspected reporting of a superior and presented some (albeit limited) evidence to support his claim.  That evidence included, among other things: (1) an incident-by-incident refutation of his counselings where he challenged their bases and argued that they were unjustified or suspect; (2) records of his annual performance reviews from before, during, and after his tenure in the Alpha Platoon, which, in his telling, did not indicate any performance deficiencies; and (3) character references from individuals who served alongside Rutledge before and after his stint as a SEAL.  Rutledge later supplemented these filings in response to the Advisory Opinion with a letter by Captain Wear that echoed Rutledge's critiques of his counselings and maintained that his performance reviews were typical for newly minted SEALs.

The Board did not address these contentions in its opinion.  It instead simply noted that Rutledge had "received multiple counselings which annotated deficiencies" in his performance and settled, without further explanation, that the evidence he had presented was "insufficient to overcome [the] presumption" of regularity that attaches to official actions.  AR 2.  Such a cursory dismissal does not count as a reasoned explanation.  By relying on the counselings as proof that Rutledge's performance was deficient, the Board glossed over Rutledge's primary contention: that these counselings were ginned up to push him out of the SEALs.  The only

explanation the Board offered for rejecting this contention was that the evidence Rutledge had marshalled did not overcome the applicable governing presumption.  But that cursory statement does not amount to the sort of reasoned explanation that the APA requires.  As courts in this District regularly have held, "although the agency need not provide an 'extensive exegis' of the rationale underlying its decisions, it must sufficiently discuss its reasoning so as to allow a court to review its decisions."  Smith v. Dalton, 927 F. Supp. 1, 5 (D.D.C. 1996).  "A naked conclusion and mere recitation that the opinion is based upon all of the evidence without an analysis of the evidence in writing (as here), is inimical to a rational system of administrative determination and ultimately inadequate."  Id. (quoting Mozur v. Orr, 600 F. Supp. 772, 781 (E.D. Pa. 1985)).  So too is the bald statement "that the evidence was insufficient [when phrased] in 'boilerplate' language that merely parrot[s] the relevant legal standard."  Hensley v. United States, 292 F. Supp. 3d 399, 410 (D.D.C. 2018).  The Board instead must furnish "a rational connection between the facts found and the choice made."  Frizelle, 111 F.3d at 176 (quoting State Farm, 463 U.S. at 43).  That connective tissue is missing here, as the Board jumped to the conclusion without providing a roadmap for the Court to follow and assess.

To be sure, the Board "substantially concurred" with the Advisory Opinion and thereby incorporated those findings into its decision.  See AR 2.  The Advisory Opinion does not provide the missing links, though, because it also devoted little airtime to Rutledge's allegations.  The Office of Legal Counsel primarily relied on the fact that Rutledge "was counseled on numerous occasions" and that, in its view, those counsellings aligned with his subpar annual performance reviews.  AR 11–12.  Here too, however, the Advisory Opinion did not expressly engage with Rutledge's various objections to his counselings.  And while it may have gone one step further by noting that these counselings aligned with his annual performance reviews, Captain Wear

directly contested that assessment in his response letter.  See AR 62.  It may be that the Advisory

Opinion had the better read of these performance reviews considering that Rutledge's average

score declined during his two years as a Navy SEAL.  Still, if the Board wished to rely on this

negative assessment, it should have responded to the contradictory opinion tendered by a senior

naval officer.  See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland, 659 F. Supp. 3d 33,

48 (D.D.C. 2023) ("An agency acts arbitrarily under § 706(2)(A) of the APA when it refuses to

consider evidence bearing on the issue before it or ignores evidence contradicting its position."

(cleaned up)).  The Navy also contends that, even if the Board's opinion did not delve into the

details, the "Administrative Record of the BCNR" shows the Board considered all of the relevant

evidence.  See Navy MSJ at 18; AR 4–8.  "The assertion that the [Board] reviewed the

administrative record . . . is not nearly enough to satisfy [its] burden to reveal the decision-

making process," however, because the Board still must explain is reasoning.  Fuller v. Winter,

538 F. Supp. 2d 179, 192 (D.D.C. 2008).  It did not do so here.

  That's not to say Rutledge carried his burden of proving that his counsellings and the

ensuing revocation of his Special Warfare Operator NEC and Navy SEAL trident was actually

retaliatory.  Far from it.  There are deficiencies in his evidentiary showing, many of which the

Navy has ably identified during this litigation.  See Navy Reply at 2–6.  As the Navy explained

in its briefs, the Board was not required to credit Rutledge's self-serving statements about his

counselings, and none of his character references are from individuals who worked with him

during his tenure as a Navy SEAL.  See id. at 4–6.  Captain Wear's letter is more relevant but

also far from definitive, as he "admit[ted] that his opinion is based on limited information."  Id.

at 4–5 (citing AR 63).  The Board, in short, may have had good reasons for denying Rutledge's

petition.  It was required to provide those reasons in its written decision, however, and the Court

"may not accept . . . counsel's *post hoc* rationalizations for [the Board's] action." State Farm, 463 U.S. at 50 (emphasis in original). The Board may believe this is a straightforward case because, in its view, Rutledge's disciplinary record supports his dismissal from the SEALs and there is insufficient evidence of retaliation. "But the [Board] must still explain [its] reasoning— and address contrary arguments—even in those cases [it] considers simple. Because the [Board] did not do so here, the decision to deny [Rutledge] the relief he requested must be set aside." Fuller, 538 F. Supp. 2d at 192–93.

On remand, the Board need not tick through and refute each exhibit, but it must at least engage with Rutledge's core arguments and address his counterevidence. See Smith, 927 F. Supp. at 5 ("[The Board must] show that it has considered all of the evidence before it and . . . state why evidence contrary to the ultimate conclusion reached was disregarded or given lesser weight." (quotation marks omitted)). Only then can the Court assess the merits of its decision under the properly deferential standard of review.

B. Trident Review Board

Turning to the TRB proceedings, Rutledge faults the Board for excusing any and all procedural irregularities during the hearing because, under Instruction 1221.1, a TRB is not required in the first place. The Navy has not attempted to defend the decision below on this basis, instead arguing that the Board did not hang its hat on this peg alone because it separately found that Rutledge had not presented "substantial evidence" needed to rebut the presumption of regularity. The Court agrees, in part. Although the Board could have been clearer in spelling out its reasoning, its independent determination that Rutledge did not sufficiently support his claims is enough to survive the particularly deferential version of arbitrary-or-capricious review here— but only for those arguments that the Board actually addressed in its decision. And, as detailed

below, the Board seemingly overlooked Rutledge's challenge that his TRB was tainted by the participation of two members who should have been disqualified because they were personally involved in some of the underlying incidents, could have been called as witnesses, and were allegedly biased against him.  That oversight also warrants a limited remand.

In Rutledge's telling, the BCNR erred by ruling out the possibility that a violation of Instruction 1221.1's procedural requirements could constitute an "error or injustice" warranting a correction because, under that Instruction, commanding officers retain complete discretion to convene a TRB in the first place.  That reasoning rests on the fallacy, Rutledge says, that because TRBs are not required, failure to follow the procedures governing TRBs cannot give rise to any "error or injustice" warranting a correction.  32 C.F.R. § 723.2(b).  It is a "fundamental principle of administrative law," however, "that an agency is bound to adhere to its own regulations." Fuller, 538 F. Supp. 2d at 186.  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.  This is so even where the internal procedures are possibly more rigorous than otherwise would be required."  Morton v. Ruiz, 415 U.S. 199, 235 (1974).  This principle that agencies must follow their own voluntarily imposed rules designed to protect individuals' rights is oftentimes referred to as the Accardi doctrine after the Supreme Court's decision in United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260 (1954), and it has been applied by courts in this jurisdiction on numerous occasions and across many domains. See, e.g., Damus v. Nielsen, 313 F. Supp. 3d 317, 335 (D.D.C. 2018) (explaining the doctrine). Rutledge maintains that that principle should apply here:  Having chosen to heed Instruction 1221.1's "strong[]" recommendation of convening a TRB, the naval officers could not then disregard the Instruction's mandatory requirements promulgated to safeguard his rights.

The Navy does not argue otherwise.  It instead contends that the Board did not hold that a failure to follow Instruction 1221.1 can *never* constitute a prejudicial error; rather, the Navy says, the Board found that the evidence Rutledge presented did not demonstrate that any such violation had occurred here.  See Navy MSJ at 22–23.  The Navy is half right.

On the first point, a fair reading of the Board's decision reveals that it did in fact hold that a procedural violation of Instruction 1221.1 could never constitute an error or injustice deserving of correction because the decision to convene a TRB is itself discretionary.  The Board wrote:

> [A]lthough the [Instruction 1221.1] strongly encourages Commanding Officers to conduct a [TRB] it is not required.  The Board noted that based upon your own description of the requirements as well as further review of the policy you provided, that your command conducted the [TRB] on 31 March 2016.  *Thus, the Board determined the evidence did not demonstrate that a material error or injustice occurred which would warrant corrective action.*

AR 2 (emphasis added).  The highlighted conclusion flows from the preceding statements only if the Board found that, because Instruction 1221.1 does not require that commanding officers convene TRBs, there can never be a "material error or injustice" simply because the TRB did not satisfy the Instruction's procedural requirements.  That is, after all, what the Advisory Opinion argued.  "Based on [Rutledge's] own description of the requirements under [Instruction 1221.1]," it said, "a TRB is encouraged but not required.  Therefore, there is no basis on which to claim that any irregularities with respect to a TRB constitute a material error or injustice."  AR 11.  The Board "substantially concurred" with the Advisory Opinion, see AR 2, and appears to have plugged this faulty reasoning into its decision.

On the second score, however, the Navy is correct that the Board did not entirely rest its decision there.  In the ensuing sentence, it added:  "Moreover, the Board relies on a presumption of regularity to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties.

20

The Board found your evidence insufficient to overcome this presumption."  AR 2.  Although cryptic, the BCNR appears to have been offering an additional basis for its decision:  The actual evidence Rutledge marshalled was insufficient to overcome the presumption of regularity and prove that the naval officers overseeing his TRB in fact violated Instruction 1221.1.  While this conclusory statement might, by itself, fall victim to the same deficiencies discussed above, the Advisory Opinion provides the missing details.  The Advisory Opinion's analysis of this matter followed a similar arch.  After staking out the categorical position that a violation of Instruction 1221.1 could never require a records correction, it continued:  "Additionally, [Rutledge] provides no evidence or witness statements to support these allegations" and failed to come forward earlier when "all information related to [the TRB] could be readily obtained."  AR 11.  And on Rutledge's allegation that a report from the TRB proceedings was never added to his file, the Advisory Opinion explained that this was entirely consistent with the Navy's "records retention procedures" and thus not indicative of any injustice.  Id.  Accordingly, the Board seems to have adopted the Advisory Opinion's reasoning that, regardless of whether a violation of Instruction 1221.1 could ever serve as the basis for corrective relief, Rutledge failed to prove that such a violation had occurred in his case.

That finding is adequately supported by the record.  The Board "relies on a presumption of regularity to support the official actions of public officers and, in the absence of substantial evidence to the contrary, will presume that they have properly discharged their official duties." 32 C.F.R. § 723.3(e)(2).  The "serviceman attempting to correct his military record" therefore "has the burden of submitting clear and convincing evidence that public officials have failed to properly perform their official duties."  Lebrun v. England, 212 F. Supp. 2d 5, 17 (D.D.C. 2002). Because the BCNR is "not an investigative body," 32 C.F.R. § 723.2(b), "the burden of proof

remain[s] with [the serviceman] at all times," <u>Poole v. Harvey</u>, 571 F. Supp. 2d 120, 125 (D.D.C. 2008).  Here, the only evidence that Rutledge presented was his own account of what transpired at the hearing.  Yet as the Advisory Opinion and (in turn) the BCNR found, such uncorroborated accusations are insufficient to rebut the presumption of regularity.  Even after the Advisory Opinion identified these deficiencies when noting Rutledge "provide[d] no evidence or witness statements to support [his] allegations," AR 11, he responded with only a signed statement of his own recollection, AR 19–24.  The Board was not required to accept this uncorroborated, self-serving description of what took place.  <u>See</u> <u>Lebrun</u>, 212 F. Supp. 2d at 17 (holding plaintiff's statement was insufficient to rebut presumption of regularity).  Nor was it required to launch an investigation to verify or disprove his account.  It was Rutledge's burden to show error, and the Court sees no basis for overturning the Board's finding that these unverified statements of what had transpired years earlier were not enough to meet that burden.

But that deference to the Board's reasoned decision extends only to matters that it actually addressed in its opinion.  And, once again, the Board overlooked some of Rutledge's core arguments.  In outlining Rutledge's grievances concerning the TRB, the Board recounted his claims that (1) he was not "timely notified" of the hearing; (2) was not "permitted an opportunity to present evidence"; and (3) "never saw a finding report."  AR 1.  That rundown skips over Rutledge's complaint that the TRB included members who, in his eyes, should have been disqualified under Instruction 1221.1's provision that no officer can serve on a TRB if he "can reasonably be expected to be called as a witness" or "may find it difficult to render a fair and impartial judgment based solely upon the evidence presented at the Board."  Instruction 1221.1, Encl. 1 ¶ 3.  In particular, Rutledge maintained that SOC Brightbill, his platoon chief, served on the TRB even though Brightbill was purportedly involved in some of the counselings

that triggered the hearing.  See AR 21, 38, 43–44, 74–75, 233.  He also objected to SOCS
Helgesen's inclusion because Helgesen had penned one of his performance reviews and because
his conversation with Helgesen about "career advice and personal issues" had led to his
counseling in February 2015.  See AR 72, 87–88.

Again, the Board may have had good reasons for dismissing this claim as well.  As with
his various other challenges to the TRB, Rutledge largely failed to present evidence, beyond his
own uncorroborated statements, that these officers both served on the TRB and were involved in
these alleged incidents.  For instance, though Rutledge appended a number of his counselings to
his petition, he did not include the counselings stemming from his conversation with Helgesen in
February 2015 or his unsuccessful dives that Brightbill purportedly orchestrated one year later.
The outcome, accordingly, could well be the same as above:  Rutledge may not have overcome
the presumption of regularity because he did not present any supporting evidence.  And while
there is evidence in the record that these officers did supervise Rutledge and drafted his annual
performance reviews before and after he left the Alpha Platoon, see AR 87–88 (2013–14 review
by Helgesen); AR 43–44 (2016–17 review by Brightbill), it is questionable whether this alone
would meet Instruction 1221.1's standard for recusal.  Moreover, regardless of the arguments
above, the Board might have concluded that this issue was not properly presented because
Rutledge expressly advanced this argument for the first time in response to the Advisory
Opinion.  See AR 21.

Therein lies the problem:  The Court is left guessing because the Board said nothing on
this issue in its opinion.  The Board was required to address this argument at the time, however,
and the Court cannot speak on the Board's behalf or fill in the gaps of its reasoning after the fact.
A remand is therefore warranted for the Board to address this argument in the first instance.

Considering all the confusion over the Board's terse and less than pellucid opinion, on remand, the Board may wish to clarify its reasoning on each of Rutledge's various challenges to the TRB.  Specifically, the Board may find it worthwhile to spell out in more detail why it deemed the evidence that Rutledge presented insufficient to rebut the presumption of regularity and "determin[e] the existence of error or injustice."  32 C.F.R. § 723.2(b).  And if the Board believes that, even if there were some procedural irregularities, those violations do not justify reinstating Rutledge's status as a Navy SEAL and his other requested relief because his demotion was substantively justified—a contention that the Navy did not advance in this litigation—it is advised to explain that position in greater detail.

## IV.   Conclusion

For the reasons above, the Court will grant Rutledge's motion for summary judgment, deny the Navy's motion, and remand the matter to the Board.  A separate order accompanies this memorandum opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: June 28, 2024